## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JAY MARTIN BARRASH, M.D.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | CIVIL ACTION NO. 4:13-cv-1054 |
| | § | |
| **AMERICAN ASSOCIATION OF** | § | |
| **NEUROLOGICAL SURGEONS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

The Court again considers whether Jay Martin Barrash, M.D., has adequately pled that the American Association of Neurological Surgeons, Inc. ("AANS") tortiously interfered with his business prospects and breached its own bylaws and rules when it publicly censured him for expert opinions expressed in connection with a Texas medical malpractice lawsuit. The Court dismissed these claims from Dr. Barrash's original complaint because they were legally deficient under Texas law, and Dr. Barrash accepted the Court's invitation to amend his pleading. The AANS contends that insufficiencies persist. As to one of Dr. Barrash's claims, the Court agrees. Defendant's Motion to Dismiss Counts I and II of Plaintiff's Amended Complaint (Doc. No. 31) will be **GRANTED** as to Count I and **DENIED** as to Count II.

## I.    FACTS

This lawsuit arises out of the decision by the AANS to censure Dr. Barrash because he purportedly violated the AANS's rules while serving as an expert witness for the plaintiff in a Texas medical malpractice case. In November 2008, Dr. Masaki Oishi, a member of the AANS, instituted an internal grievance against Dr. Barrash, a fellow member, alleging that he violated the AANS's Rules for Neurosurgical Medical/Legal Expert Opinion Services (the "Rules for

1

Expert Opinion Services"). (Doc. No. 27 ("Am. Compl.), at ¶ 44.) After Dr. Barrash participated

in a hearing before the AANS Professional Conduct Committee and exercised two levels of

appeal, the AANS general membership found that Dr. Barrash had violated certain of its Rules

for Expert Opinion Services and issued him a public censure in April 2011. (*Id*. at ¶¶ 57, 94-95,

99, 115-16.)

The AANS is an Illinois scientific and educational non-profit association with over 8,000

members worldwide. (Am. Compl. ¶¶ 8-9.) Dr. Barrash was a member of the AANS from 1975

until he voluntarily resigned from the association in 2011. (*Id*. at ¶ 38.) The AANS has adopted a

Code of Ethics and Rules for Expert Opinion Services with which its members are required to

comply. (*Id*. at ¶¶ 24-25, 41.) The AANS Code of Ethics states, in relevant part:

> The neurological surgeon, as an expert witness, shall diligently and
> thoroughly prepare himself or herself with relevant facts so that he or she
> can, to the best of his or her ability, provide the court with accurate and
> documental opinions on the matters at hand. (Id. at ¶ 24; App. A–2 at
> (e)(2)).

(*Id*. at ¶ 24; Doc. No. 31-2 (App. A-2), at 31.) The AANS Rules for Expert Opinion Services

provide, in pertinent part:

**A.    Impartial Testimony**

1.    The neurosurgical expert witness shall be an impartial educator for
      attorneys, jurors and the court on the subject of neurosurgical
      practice.

. . .

**B.    Subject Matter Knowledge**

**. . .**

2.    The neurosurgical expert witness shall review all pertinent
      available medical information about a particular patient prior to
      rendering an opinion about the appropriateness of medical or
      surgical management of that patient.

(*Id*. at ¶ 25; Doc. No. 31-2 (App. A-2), at 36.)

Dr. Barrash was retained as an expert witness by the claimant in a medical malpractice suit filed against Dr. Oishi in McLennan County, Texas (the "Glass Malpractice Action"). (Am. Compl. ¶¶ 26-27.) The claimant, Mr. Bill N. Glass, had undergone a posterior lumbar interbody fusion ("PLIF") on February 2, 2004 (the "First Surgery"). (*Id*. at ¶ 13.) That surgery— performed by Dr. Oishi—involved adding bone grafts between multiple vertebrae in Mr. Glass's spine to trigger a biological response that causes bone to grow and fuse the vertebral elements together. (*Id*. at ¶ 14.) Mr. Glass awoke from the First Surgery with severe pain in his left leg. (*Id*. at ¶ 15.) A month later, a CT scan showed that one of the bone grafts installed in the First Surgery was in the wrong position and impinging on one of Mr. Glass's nerve roots. (*Id*. at ¶ 16.) Dr. Oishi operated again on March 7, 2004 (the "Second Surgery") to relieve the impingement, but was able to remove only part of the offending bone graft because it was firmly wedged in between two of Mr. Glass's vertebrae. (*Id*. at ¶ 17.) After the Second Surgery, Mr. Glass developed a serious postoperative infection. (*Id*. at ¶ 18.) Dr. Oishi operated again (the "Third Surgery"), and Mr. Glass was hospitalized for an intensive treatment of a postoperative staph infection, which developed into an infection of the bone. (*Id*. at ¶¶ 19-20.) Following his treatment by Dr. Oishi, Mr. Glass suffered chronic pain and was unable to work. (*Id*. at ¶ 21.)

In the Glass Malpractice Action, Dr. Barrash prepared a pre-suit written expert report supporting the claims and later provided expert deposition testimony. (Am. Compl. ¶¶ 27, 30.) Dr. Barrash offered several expert opinions criticizing Dr. Oishi's treatment of Mr. Glass, including:

(1)     One of the bone grafts installed at the First Surgery was either not appropriately placed or had moved during the surgery. (*Id*. at ¶ 30.)

3

(2)     Dr. Oishi took too long to perform the First Surgery. (*Id*. at ¶ 70.)

(3)     Dr. Oishi did not adequately prevent or treat Mr. Glass's postoperative infection. (*Id*. at ¶ 30.)

(4)     Dr. Oishi's inadequate treatment of Mr. Glass's postoperative infection was the cause of his chronic pain. (*Id*. at ¶ 72.)

Dr. Oishi subsequently settled the case. (*Id*. at ¶ 36.)

Upon the conclusion of the Glass Malpractice Action, Dr. Oishi—utilizing the AANS's internal procedures—brought charges against Dr. Barrash for violations of the Code of Ethics and the Rules for Expert Opinion Services. (Am. Compl. ¶ 44.) Dr. Oishi accused Dr. Barrash of providing unduly biased testimony in the Glass Malpractice Action and of failing to review all pertinent available medical information before rendering his opinion about Dr. Oishi's management of the patient. (*Id*.)

Dr. Oishi's charges against Dr. Barrash were forwarded to the AANS Professional Conduct Committee (the "PCC"). (Am. Compl. ¶¶ 43, 49.) Dr. Barrash submitted written responses to Dr. Oishi's complaints. (*Id*. at ¶ 48.) A hearing was conducted on October 25, 2009, at which both Dr. Oishi and Dr. Barrash were questioned by six members of the PCC. (*Id*. at ¶¶ 57, 62-63.) The PCC subsequently determined that Dr. Barrash had violated the Rules for Expert Opinion Services and recommended in a written report to the AANS Board of Directors (the "PCC Report") that the AANS suspend Dr. Barrash's membership for six months. (*Id*. at ¶¶ 69-74.) After considering the PCC's recommendations, the Board of Directors agreed that Dr. Barrash's testimony violated the Rules for Expert Opinion Services, but decided to censure him instead of suspending his membership. (*Id* at ¶¶ 96-98.) Dr. Barrash exercised his right under the AANS bylaws to appeal the decision of the Board of Directors to the AANS membership. (*Id*. at ¶ 99.) Dr. Barrash made a statement to the membership in support of his appeal; the President of

the AANS made a statement in support of the decision of the Board to censure Dr. Barrash (the "President's Statement). (*Id.*)

The appeal was heard on April 11, 2011 at the Annual Business Meeting of the AANS. (Am. Compl. ¶ 115.) The members voted to uphold the censure. (*Id.*) On April 12, 2011, the AANS published a Notice of Censure on its website, stating:

> Dr. J. Martin Barrash, following an appeal to the AANS general membership on April 11, 2011, has been censured for giving expert testimony without having seen the imaging studies relevant to that testimony, and for failure to provide unbiased testimony during part of a deposition in a civil lawsuit.

(*Id.* at ¶ 116.)

## II.   PLAINTIFF'S AMENDED CLAIMS AND DEFENDANT'S MOTION TO DISMISS

Dr. Barrash asserts claims against the AANS for tortious interference with prospective business relations and economic advantage (Count I), breach of the AANS Bylaws (Count II), and impairment of important economic interest from denial of "due process" (Count III). The AANS seeks to dismiss Count I and Count II.

Count I (Tortious Interference) was previously dismissed for failure to allege certain elements of the underlying torts on which the claim is based. (Doc. No. 26, at 6-8.) In the Amended Complaint, Dr. Barrash alleges that the PCC Report, the President's Statement, and the Notice of Censure contained affirmative misrepresentations of fact and omitted material facts. (Am. Compl. ¶ 127.) Dr. Barrash claims that, due to these misrepresentations and omissions, the AANS engaged in business disparagement and fraudulently or negligently induced its membership to approve Dr. Barrash's censure. (*Id.* at ¶¶ 127-29.) The AANS moves to dismiss this claim, arguing that Dr. Barrash's allegations fail to establish necessary elements of the

underlying torts of fraud, negligent misrepresentation, and business disparagement. (Doc. No. 31 ("Mot."), at 9-14.)

Count II (Breach of Contract) was previously dismissed for failure to allege an exception to the doctrine of judicial non-intervention in the internal affairs of a private, voluntary membership organization. (Doc. No. 26, at 10-11.) The Amended Complaint claims that the AANS acted arbitrarily and capriciously and substituted legislation for interpretation when it decided to censure Dr. Barrash. (Am. Compl. ¶¶ 145-54.) The AANS argues that Dr. Barrash has again failed adequately to plead an exception to the doctrine of judicial non-intervention. (Mot. at 15-17.)

## III.    LEGAL STANDARD

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). A complaint will survive a motion for dismissal only if the

plaintiff pleads sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570.

## IV.    ANALYSIS

### A.    Count I: Tortious Interference

The Texas Supreme Court has held that an act of interference with prospective business relations is not actionable unless it independently constitutes a tort or violates state law. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Dr. Barrash contends that the AANS's actions in censuring him were independently wrongful in either of two ways. First, Dr. Barrash characterizes several statements in the PCC Report, President's Statement, and Notice of Censure as fraudulently or negligently misleading. He also contends that those documents were made misleading by several fraudulent or negligent omissions. (Am. Compl. ¶¶ 127, 129.) Second, Dr. Barrash claims that the AANS engaged in business disparagement. (*Id.* at ¶ 128.)

Both of Dr. Barrash's theories require the AANS to have circulated false or misleading statements about Dr. Barrash. The Amended Complaint details nine alleged affirmative misstatements and twelve alleged omissions from the PCC Report; seven alleged affirmative misstatements and eight alleged omissions from the President's Statement; and two alleged affirmative misstatements from the Notice of Censure. (Am. Compl. ¶ 127.) The AANS argues that none of these misstatements or omissions is actually false or misleading.[1] (Mot. at 12.) Because a false or misleading statement is a required element of fraud, negligent misstatement,

---

[1] The AANS also argues, alternatively, that the alleged misstatements and omissions from the PCC Report and President's Statement are "red herrings," because they were not made available to the public. (Doc. No. 42 ("Reply"), at 5.) The Amended Complaint describes how the PCC Report and President's Statement were necessary steps in the censure process and alleges that misstatements and omissions in those documents caused their intended audiences to vote in favor of the censure, which was publicized and ultimately caused Dr. Barrash harm. The Court finds these allegations sufficient at the pleading stage.

and business disparagement, the AANS continues, Dr. Barrash has not properly pled any underlying tort, and his claim for tortious interference must be dismissed.

### a.    PCC Report

Dr. Barrash complains that the PCC Report inaccurately paraphrased five separate portions of his deposition testimony. (Am. Compl. ¶¶ 127(b)(i)-(v).) The Court has compared the PCC Report to the underlying deposition testimony. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (noting that a district court, considering a motion to dismiss, may take into consideration "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim"). Three of the paraphrasings in the Report do appear inaccurate, but the inaccuracies are so minor as to be either immaterial or not disparaging. These include the use of the phrase "impact out" rather than "backed out" in the testimony concerning the possibility that Mr. Glass's bone graft had retropulsed following the First Surgery and two passages concerning Dr. Oishi's management of Mr. Glass's postoperative infection.[2] (Am. Compl. ¶¶ 127(b)(i)-(ii), 127(b)(iv).) The Court also notes that the PCC expressed no disapproval of Dr. Barrash's testimony regarding the postoperative infection treatment, making it particularly implausible that mischaracterizations of such testimony caused Dr. Barrash any harm.

The remaining two alleged inaccurate renderings of Dr. Barrash's testimony fairly depict that testimony. The PCC Report states that Dr. Barrash testified that "posterior hardware will prevent graft retropulsion." (Doc. No. 31-3 (App. A-5), at 6.) The Court has reviewed the underlying deposition testimony—in which Dr. Barrash stated that, with posterior hardware, "[t]here's no movement [of the bone graft]"[3]—and concludes that the PCC Report's

---

[2] "Retropulse" or "retropulsion" is a term used to describe an unintended movement of a bone graft. (Am. Compl. ¶ 33.)

paraphrasing is accurate. To the extent Dr. Barrash complains that the Report omits his later testimony that the bone graft could come loose even in the presence of posterior hardware if the patient "fall[s] down a flight of stairs and fracture[s] a hardware and dislocate[s] a graft,"[4] this omission does not render the above statement misleading or unfair.

The PCC Report also states that Dr. Barrash testified that he "did not see any imaging studies." (Doc. No. 31-3 (App. A-5), at 6.) The following is the full passage from Dr. Barrash's deposition on which this paraphrasing is based:

> Q:    That reminds me. By the way, did you look at any X-rays in this case?
>
> A:    No, I have not.
>
> Q:    Did you feel any need to?
>
> A:    No, not really.
>
> Q:    Okay.
>
> A:    I mean, I would have liked to, but I think the reports are well documented here.
>
> Q:    Why would you want to look at films in this case?
>
> A:    Well, I would like to see the lumbar spine, the preoperative study, and the studies that were done that demonstrated that the plug was not appropriately placed. I would have liked to have seen that.
>
> Q:    Okay. Those films might actually show that the plug was appropriately placed. Could the films actually show that the plug was appropriately placed and just retropulsed?
>
> A:    Well, no. Because the films may not show it. A CAT scan would or an MRI would.
>
> Q:    Okay. You haven't looked at any CAT scans or MRIs either, have you?

---

[3] (Doc. No. 31-3 (App. A-5), at 25.)
[4] (Doc. No. 31-3 (App. A-5), at 25-26.)

> A:      I haven't seen any radiographic representations.

(Doc. No. 31-3 (App. A-5), at 34.) The testimony could not be clearer, and it is accurately captured in the PCC Report's summary of his deposition testimony. Dr. Barrash apparently complains that this testimony differs from statements made in his written expert report and other submissions. (Am. Compl. ¶ 77(e).) But discrepancies among Dr. Barrash's various testimonials does not make the PCC Report's summary of his deposition testimony false or misleading.

Dr. Barrash claims that affirmative misrepresentations can also be found in the section of the PCC Report summarizing the "discussion of the Committee" regarding his "failure to review" intraoperative x-rays taken during the First Surgery. The first alleged misrepresentation is the statement that "Dr. Barrash never personally saw the imaging studies relevant to this litigation." (Doc. No. 31-3 (App. A-5), at 10.) For the reasons described above, this accurately depicts Dr. Barrash's deposition testimony. Moreover, Dr. Barrash reinforced this testimony in his written submissions to the PCC. (*Id.* at 49 ("His stating that I never looked at the x-rays is absolutely true as I admitted in the deposition.").) He did so again in his testimony to the PCC, when he stated that it "would have been better" to see the intraoperative x-rays before testifying against Dr. Oishi but "they weren't provided to me." (*Id.* at 89.)

Dr. Barrash contends that the PCC Report also mischaracterizes his defense to the charge that he failed to review the pertinent imaging studies prior to giving his testimony. The PCC Report states: "Dr. Barrash defends his failure to review these x-rays saying that they were not provided to him by the plaintiff attorney." (Doc. No. 31-3 (App. A-5), at 10-11.) The transcript of the PCC hearing makes clear that this was at least one of Dr. Barrash's defenses. (*Id.* at 88-90.) Dr. Barrash's real criticism of the statement, then, is not that it is inaccurate, but that it is incomplete. The Amended Complaint clarifies that "Dr. Barrash 'defended' his failure to review

the unavailable x-ray with testimony that he had reviewed the radiologists' reports of the x-rays and the significance of subsequent events and imaging studies reported in the records he reviewed." (Am. Compl. ¶ 88.) Dr. Barrash ignores that the PCC Report elsewhere fairly captured his additional defenses. In the summary of the PCC hearing, the Report states:

> Dr. Barrash admitted that it would have been best had he seem the films, but asserted that they had not been provided by the attorney *and that he had read the radiographic reports and knew and trusted the radiologists who had produced them.*

(Doc. No. 31-3 (App. A-5), at 8 (emphasis added).) It also accurately depicts the articulated bases of Dr. Barrash's ultimate conclusion that the bone graft was improperly placed:

> Dr. Barrash also based this assertion upon the relative fixation of the graft at the second surgery on March 7, 2004, the presence of posterior instrumentation and the left leg pain following the first surgery and relieved after the second surgery.

(*Id.* at 10.) This information may not have been organized in the PCC Report in the manner Dr. Barrash would have preferred. But this does not make the Report misleading or fraudulent. Dr. Barrash's defenses and justifications were fairly and accurately depicted in the PCC Report.

Finally, Dr. Barrash complains that several of the PCC Report's conclusions are inaccurate. These include the finding that Dr. Barrash "could and should have declined to testify until he had been provided the available and relevant x-rays;" that "[f]ailure to do so was contrary to Rule B2 and was unprofessional;" that Dr. Barrash's testimony about the bone graft position was "(in the opinion of the PCC members) incorrect;" and that Dr. Barrash's opinion about the cause of Mr. Glass's chronic pain "can only be speculation." (Doc. No. 31-3 (App. A-5), at 11.) There is no allegation that the PCC did not actually reach these results and findings. And Dr. Barrash's disapproval of the ultimate result is not sufficient to render the statements

false or misleading. As the AANS correctly points out, legitimate and honest disagreement between the parties is not fraud.

Dr. Barrash also claims that the PCC Report was rendered misleading by a variety of alleged omissions. Texas law recognizes that a collection of statements, all technically true, can nonetheless mislead or leave a false impression either because it "omit[s] material facts" or because it "juxtapos[es] facts in a misleading way." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). The Court has carefully reviewed Dr. Oishi's written complaints; Dr. Barrash's written defenses; the transcript of the PCC hearing; and the full PCC Report. It finds the alleged "omissions" identified by Dr. Barrash to be insufficient as a matter of law.

Dr. Barrash complains that the PCC Report omitted the specifics of Dr. Oishi's charges against him; omitted that Dr. Oishi had accused Dr. Barrash of violating all but one of the Rules for Expert Opinion Services; and omitted that Dr. Oishi had not charged Dr. Barrash of engaging in "improper advocacy." (Am. Compl. ¶¶ 127(c)(iii)-(iv), 127(c)(xi).) If the PCC Report had purported to catalog exhaustively all of Dr. Oishi's complaints, some of these "omissions" may be actionable. But the PCC Report acknowledged that its depiction of Dr. Oishi's charges was an incomplete summary when it stated that the complaints "include" five specific charges. (Doc. No. 31-3 (App. A-5), at 6-7.) Moreover, Dr. Oishi's written complaints were attached to the PCC Report as Tab A. (*Id.* at 2, 15-17.) The PCC Report's high-level summary of Dr. Oishi's charges was neither affirmatively inaccurate nor misleading due to the specific charges omitted from the Report but attached to it.

Dr. Barrash also complains that the PCC Report—which, at several points, notes that Dr. Barrash did not review the intraoperative x-rays—omitted his testimony that he did not need to review the intraoperative x-rays because he had the relevant radiology reports. (Am. Compl. ¶

127(c)(ii).) The Court disagrees that the "omission" of this testimony leaves an inaccurate impression of the relevant facts. Dr. Barrash admitted, time and again, that he did not review the intraoperative x-rays. Moreover, the PCC Report includes a direct reference to Dr. Barrash's justification that he felt like the radiologists' reports were sufficient for his purposes. (Doc. No. 31-3 (App. A-5), at 8.)

Dr. Barrash next contends that the PCC Report was misleading because it omitted the bulk of his testimony at the PCC hearing regarding his conclusion that the bone graft was improperly placed at the First Surgery. (Am. Compl. ¶¶ 127(c)(v)-(viii).) As Dr. Barrash testified, the bases for this conclusion included that Mr. Glass woke from the First Surgery with significant pain in his leg; that the pain was relieved by Dr. Oishi's removal of part of the bone graft and instrumentation in the Second Surgery; and that Dr. Oishi had to drill to remove the bone graft and was unable to remove all of it because it was so firmly wedged and immobile. These omissions might be problematic, if the PCC Report more fully depicted Dr. Oishi's or the PCC committee members' testimony while minimizing Dr. Barrash's. No such imbalance exists. The PCC Report summarizes the contents of the 75-page hearing transcript in approximately two pages. (Doc. No. 31-3 (App. A-5), at 7-9.) Contrary to Dr. Barrash's allegations, it does not wholly omit that Dr. Barrash and the PCC committee members discussed his theories regarding Mr. Glass's postoperative leg pain. It simply distills those discussions to three concise sentences: that Dr. Barrash "explained his view as to the mechanism of the postoperative leg pain following the first operation;" that "Dr. Heros questioned Dr. Barrash in regard to several technical points regarding his theory that the interbody graft had been improperly placed;" and that there was "an extensive discussion of possible mechanisms of the postoperative left leg plan and its relief by the second operation." (*Id.* at 8-9.) These sentences are not inaccurate, nor are they misleading

by their brevity. Additionally, the bases of Dr. Barrash's conclusion are adequately expressly elsewhere in the PCC Report, under the Committee's discussion of his failure to review the intraoperative x-rays. (*Id.* at 10 ("Dr. Barrash also based [his conclusion] upon the relative fixation of the graft at the second surgery on March 7, 2004, the presence of posterior instrumentation and the left leg pain following the first surgery and relieved after the second surgery.").)

Dr. Barrash raises similar complaints regarding the PCC Report's "omission" of his testimony in response to committee members' questions on his decision to testify without having seen the intraoperative x-rays and his opinion regarding the cause of Mr. Glass's chronic pain. (Am. Compl. ¶¶ 127(c)(ix)-(x).) For the reasons articulated above, the PCC Report's failure to recount the relevant dialogues in detail does not render its summary of the hearing inaccurate or misleading.

Finally, Dr. Barrash complains that the PCC Report omitted details regarding Mr. Glass's medical history which support his expert testimony. (Am. Compl. ¶¶ 127(c)(i), 127(c)(xii).) Once again, the PCC Report summarized Mr. Glass's extensive medical history in just over two pages. Although Dr. Barrash clearly would have preferred these details be included in the PCC Report's recitation of Mr. Glass's medical history, their omission is not so significant or glaring as to present an inaccurate picture of the dispute.

In summary, Dr. Barrash's primary criticism of the PCC Report's alleged "omissions" is that his defenses were not exhaustively presented. This is true, but also unavoidable in a high-level Report which summarizes the contents of multiple, lengthy writings, transcripts, and conversations—most of which were attached to the Report as exhibits. The PCC Report fairly

14

depicted all of Dr. Barrash's defenses. Consequently, none of the identified "omissions" is sufficient to support a fraud, negligent misrepresentation, or business disparagement claim.

### b.    President's Statement

Dr. Barrash claims that seven separate passages from the President's Statement contained affirmative misrepresentations of fact. (Am. Compl. ¶¶ 127(d)(i)-(vii).) Four of these alleged misstatements are identical to passages from the PCC Report; for the reasons discussed above, these statements are either not inaccurate or are immaterial. (*Id.* at ¶¶ 127(d)(ii)-(v).) The remaining three passages constitute the findings and conclusions of the AANS Board of Directors. (*Id.* at ¶¶ 127(d)(i), 127(d)(vi)-(vii).) Dr. Barrash has not alleged that the AANS Board of Directors failed actually to reach these findings and conclusions. As noted above, his disagreement with the Board's decision is not sufficient to make the recitation of the decision fraudulent or disparaging.

Dr. Barrash also argues that the President's Statement suffers from eight misleading omissions. Several of these omissions are identical to alleged omissions from the PCC Report. (Am. Compl. ¶¶ 127(e)(i)-(iv), 127(e)(vi)-(vii).) These omissions were not sufficient to render the PCC Report misleading. The same conclusion must be reached as to the President's Statement. Both documents are high-level summaries. Through the drafting process, relevant information was invariably going to be left out for purposes of brevity. As long as this omitted information was not necessary to clarify or provide context for the material that remains, the decision to omit it cannot plausibly be construed as fraud, negligent misrepresentation, or business disparagement.

Dr. Barrash identifies two additional omissions which distinguish the President's Statement from the PCC Report. With these omissions, the President's Report fails to present or

respond to all of Dr. Barrash's defenses to Dr. Oishi's charges. The first omission is the absence of any reference to Dr. Barrash's testimony that he had access to, reviewed, and trusted radiologists' reports regarding the intraoperative x-rays he failed personally to review. (Am. Compl. ¶ 127(e)(v).) The second omission is the absence of any reference to Dr. Barrash's rationales for his opinion that Dr. Oishi's negligent handling of Mr. Glass's postoperative infection was the cause of Mr. Glass's resultant chronic pain. (*Id.* at ¶ 127(e)(viii).) Moreover, unlike the PCC Report, these omissions do not appear to have been ameliorated by the attachment of the PCC hearing transcript or Dr. Barrash's written submissions to the PCC committee.

The Court agrees with Dr. Barrash that these omissions would be sufficient to allege that the President's Statement is misleading, if the President's Statement purported to present both sides of the dispute equally. But the President's Statement is expressly captioned as the "Response of the AANS Board of Directors to the Appeal by J. Martin Barrash, M.D." (Doc. No. 31-4 (App. A-6), at 2.) It is clearly organized as a counterpoint to a written appeal from Dr. Barrash. (*See, e.g., id.* at [183] ("We feel compelled to respond to another issue which Dr. Barrash has raised in his appeal.").) The Amended Complaint also acknowledges that, in this stage of the censuring process, Dr. Barrash and the AANS Board prepared and submitted *competing* statements in support of their respective positions to the AANS membership at large. (Am. Compl. ¶¶ 99-100.) Consequently, any alleged omission of Dr. Barrash's justifications and defenses in the President's Statement—as opposed to an outright misstatement—cannot credibly be cast as fraud, negligent misrepresentation, or business disparagement. As with the PCC Report, the Court concludes that Dr. Barrash has failed to identify any way in which the President's Statement was false or misleading.

c.        **Notice of Censure**

The Notice of Censure contains only two phrases. Dr. Barrash claims both phrases are inaccurate. The Court disagrees.

The first half of the Notice of Censure states that Dr. Barrash was censured "for giving expert testimony without having seen the imaging studies relevant to that testimony." (Am. Compl. ¶ 116.) Dr. Barrash has not adequately explained how this statement is false or misleading. His criticisms concern his disagreement with the conclusion that he violated the Rules for Expert Services. Once again, his disapproval of the result of the censuring process does not make the recitation of his censure false or misleading.

Dr. Barrash also criticizes the second part of the Notice of Censure, which states that he was censured "for failure to provide unbiased testimony during part of a deposition in a civil lawsuit." (Am. Compl. ¶ 116.) This statement is accurate, although incomplete. The PCC found that Dr. Barrash had twice acted as an "improper advocate" during the Glass Malpractice Action. One of these was during his deposition, when he claimed that Dr. Oishi took too long to perform the First Surgery. (Doc. No. 31-3 (App. A-5), at 10.) The other was in his pre-suit expert report, when he concluded that Mr. Glass's chronic pain syndrome was caused by Dr. Oishi's poor management of the postoperative infection. (*Id*. at 11.) Although the omission of the pre-suit expert report from the Notice of Censure may have been misleading, it was misleading in a way favorable to or at least neutral to Dr. Barrash. Because it is not plausible that the omission of the pre-suit expert report from the Notice of Censure caused Dr. Barrash harm, it does not qualify as fraud, negligent misstatement, or business disparagement.

In summary, the PCC Report, President's Statement, and Notice of Censure contain no affirmative misrepresentations of material fact and suffer from no misleading omissions. Because

17

falsity is an indispensable element of fraud, negligent misrepresentation, and business disparagement, Dr. Barrash has failed adequately to allege that the AANS's "interference" was independently wrongful or tortious. The Court must grant the AANS's motion as to Count I for tortious interference with contract.

### B.    Count II: Breach of Contract

The Court previously determined that Texas law applies to Dr. Barrash's breach of contract claim. (Doc. No. 26, at 8-9.) Typically, Texas courts will not intervene in disputes between a private, voluntary membership organization and its members:

> The right of a voluntary club or association to interpret its own organic agreements, such as its charter, its by-laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them, and an individual, by becoming a member, subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules.

*Harden v. Colonial Country Club*, 634 S.W.2d 56, 59 (Tex. App.—Fort Worth 1982, writ refused n.r.e.). As a result, "the requirements for judicial review are more than a mere breach of [an association's] own policies." *Dallas Cnty. Med. Soc'y v. Ubinas-Brache, M.D.*, 68 S.W.3d 31, 42-43 (Tex. App.—Dallas 2001, no pet.).

There are exceptions to the doctrine of judicial non-intervention. As multiple cases observe, a court may intercede in a dispute between a private organization and its member if the organization has "substitute[d] legislation for interpretation;" if it has "transgress[ed] the bounds of reason, common sense, [or] fairness;" or if it has "contravene[d] public policy, or the laws of the land." *Bhd. Of R.R. Trainmen v. Price*, 108 S.W.2d 239, 241 (Tex. Civ. App. 1937); *see also Harden*, 634 S.W.2d at 60 ("We hold that the actions of the Board of Governors of appellee, so long as they are not illegal, not against some public policy, not arbitrary, capricious, or fraudulent, are proper actions, permissible and binding on the members of this Club.").

18

Unfortunately, few courts find such exceptions to be present. This provides the Court little guidance as to what allegations are necessary to overcome the substantial deference due to the AANS under Texas law. The Court begins with an analysis of whether Dr. Barrash has pled factual allegations sufficient to meet the relevant pleading standard of facial plausibility.

### 1. Dr. Barrash has adequately pled that the AANS acted arbitrarily and capriciously and substituted legislation for interpretation when it censured him for engaging in "improper advocacy."

The Amended Complaint alleges that the AANS's decision to censure Dr. Barrash was arbitrary and capricious in a multitude of ways. Most of the allegations do not plausibly allege an exception to the doctrine of judicial non-intervention. Specifically:

- The Amended Complaint states that the AANS did not consider Dr. Barrash's reliance on radiologists' reports and Glass's medical history. (Am. Compl. ¶ 154(a).) This allegation is belied on the face of the PCC Report. (Doc. No. 31-3 (App. A-5), at 8, 10.)

- The Amended Complaint states that the AANS did not consistently interpret its bylaws and rules. (Am. Compl. ¶ 154(c).) If this statement had factual allegations to support it—for example, if another AANS member had not been sanctioned for engaging in conduct identical to Dr. Barrash—then it might be sufficient to show that the AANS acted arbitrarily or capriciously against Dr. Barrash. Legal conclusions, however, do not substitute for factual allegations in a Rule 12(b)(6) review of a pleading. *See Fernandez-Montes*, 987 F.2d at 284.

- The Amended Complaint states that the AANS acted as an advocate for sanctions against Dr. Barrash. (Am. Compl. ¶ 154(g).) But it fails to explain how this was a breach of the bylaws or rules. Moreover, a "mere breach" of AANS policies is not sufficient for judicial intervention. *Ubinas-Brache*, 68 S.W.3d at 42-43. The allegation that the AANS exceeded its own bylaws by doing more than sustaining or not sustaining Dr. Oishi's charges suffers from the same flaw. (Am. Compl. ¶ 154(f).)

- The Amended Complaint states that the AANS disproportionately disciplines members who testify against other members and in support of medical malpractice claimants. (Am. Compl. ¶ 155.) Even accepting this representation as true, it cannot show that the AANS acted arbitrarily or capriciously in Dr. Barrash's case. Similarly, the Amended Complaint states that the AANS's censure of Dr. Barrash violated public policy because it discourages doctors from acting as experts on behalf of medical malpractice claimants. (*Id.* at ¶¶ 158-59.)

This would expose the AANS to judicial review every time it decided to discipline a member for violation of the Rules for Expert Opinion Services. The Court cannot accept such a broad exception, which threatens to swallow the doctrine of judicial non-intervention.

The only remaining basis for judicial intervention is Dr. Barrash's allegation that he was censured for conduct not prohibited by the Rules, an act of legislation masquerading as interpretation. (Am. Comp. ¶¶ 146-53, 154(d)-(e); Doc. No. 37 ("Opp."), at 21-25.) To the extent that this criticism is leveled against the finding that Dr. Barrash violated Rule B2 of the Rules for Expert Opinion Services, it is legally insufficient. Dr. Barrash clearly disagrees with the PCC and the AANS Board's interpretation of Rule B2 and their application of the rule to his case. His interpretation of the rule is not unreasonable; it may even be preferable to the interpretation adopted by the AANS and ratified by the general membership in their vote to censure Dr. Barrash. But his vociferous, full-throated defense of his position does not transmute the AANS's action from interpretation to legislation. The allegations in the Amended Complaint do not plausibly allege that the AANS's decision to censure Dr. Barrash for violating Rule B2 should be subject to any judicial review, other than perhaps a review for "due process."

But Dr. Barrash also complains that the AANS engaged in legislation rather than interpretation when it censured him for engaging in "improper advocacy." (Am. Compl. ¶¶ 149-53.) In this regard, Dr. Barrash's allegations are plausible. The Rules for Expert Opinion Services do not contain the phrase "improper advocacy," much less define it. (Doc. No. 31-2 (App. A-2), at 36-37.) Moreover, a review of the PCC hearing transcript shows that the PCC members did not criticize Dr. Barrash's methodology, diligence, or subject matter expertise with regard to his "improper" opinions—they simply disagreed with his substantive conclusions. (Doc. No. 31-3 (App. A-5), at 121-23.) Dr. Barrash characterizes the AANS's standard for "improper advocacy" as "nothing more than it knows it when it sees it." (Opp. at 23.) The Court

finds this characterization not unfair. Dr. Barrash has plausibly alleged that the AANS acted arbitrarily and capriciously when it censured him for testimony that he could not have known was prohibited, based on a rule that does not appear to have existed.

> **2.     Dr. Barrash may pursue judicial review of the decision to censure him for "improper advocacy" through a breach of contract claim.**

The AANS argues, alternatively, that even if Dr. Barrash has adequately pled an exception to the doctrine of judicial non-intervention, the proper claim to raise is a due process claim, not a breach of contract claim. (Doc. No. 42 ("Reply"), at 3.) Because this argument was first made in the AANS's reply brief, the Court does not have the benefit of Dr. Barrash's response.

The AANS's failure to raise this argument in its opening brief is sufficient to deny it. *See Conway v. U.S.*, 647 F.3d 228, 237 n.8 (5th Cir. 2011) ("Arguments raised for the first time in a reply brief are forfeited."). Moreover, the AANS provided no authoritative case law supporting its position. Despite these deficiencies, the Court shares the AANS's concerns that the proper vehicle for judicial review of the AANS's decision to censure Dr. Barrash for engaging in "improper advocacy" is a lack of due process claim, not a breach of contract claim. Therefore, should the AANS wish to pursue this argument further in the context of Rule 12(b)(6), it is ordered to file a supplemental motion to dismiss within 21 days of the entry of this order. The supplemental motion shall be limited to this argument and shall be no longer than 15 pages.

## V.     CONCLUSION

For the reasons stated above, Dr. Barrash has not adequately pled that the AANS engaged in independently wrongful or tortious conduct when it decided to publicly censure him for expert opinions rendered in the Glass Malpractice Action. Defendant's Motion to Dismiss Counts I and II (Doc. No. 31) is therefore **GRANTED** as to Count I of the Amended Complaint. Because Dr.

Barrash has adequately pled an exception to the doctrine of judicial non-intervention, and because the AANS failed to argue in its opening brief that breach of contract is not the proper claim to raise for judicial review of the censure, Defendant's Motion is **DENIED** as to Count II.

In addition to the AANS's Motion to Dismiss, two discovery motions filed by Dr. Barrash are also pending. The Court heard arguments on these motions, but deferred ruling until resolution of the Motion to Dismiss. As indicated at the prior hearing, Dr. Barrash's Motion to Compel Response to Request for Production (Doc. No. 33) is **GRANTED**. Documents should be produced for attorney's eyes only, at Dr. Barrash's cost, within 30 days of the entry of this order. The Court further defers Dr. Barrash's Motion to Compel Answers to Requests for Admission (Doc. No. 30) pending the AANS's supplemental motion to dismiss, if such a motion is filed.

**IT IS SO ORDERED.**

**SIGNED** in Houston, Texas, on this the 31st day of January, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE