UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAY MARTIN BARRASH, M.D., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:13-cv-1054 |
| § | |
| AMERICAN ASSOCIATION OF § | |
| NEUROLOGICAL SURGEONS, INC., § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Dr. Jay Martin Barrash ("Dr. Barrash" or "Plaintiff") believes he was unfairly, even maliciously, maligned when the professional organization of which he was part—the American Association of Neurological Surgeons, Inc. (the "AANS" or "Defendant")—publicly censured him in 2011. He seeks judicial review of the disciplinary process afforded him by the AANS.[1]

With the exception of Dr. Barrash's alleged damages, the facts are undisputed. Both sides have moved for summary judgment on the question of whether the AANS provided due process to Dr. Barrash when it censured him. The Court has reviewed the motions filed by both sides, all responses and replies thereto, and the applicable law, and finds that Defendant's Motion for Summary Judgment (Doc. No. 78) must be **GRANTED IN PART** and that Plaintiff's Motion for Partial Summary Judgment (Doc. No. 80) must be **GRANTED IN PART** and **DENIED IN PART**. Because the Court is unable on the basis of the parties' current submissions to determine what remedy is both sought by and available to Dr. Barrash, it reserves judgment on the

---

[1] Dr. Barrash initially asserted three claims against the AANS: (1) tortious inference with prospective business relations and economic advantage, (2) breach of the AANS Bylaws, and (3) violation of due process. The Court dismissed the first two claims earlier this year. (Doc. Nos. 45, 63.)

1

remainder of Defendant's Motion for Summary Judgment (Doc. No. 78) and will schedule a telephonic hearing in advance of the October 28, 2014 trial date.

## I. BACKGROUND[2]

The AANS is an Illinois scientific and educational non-profit association with over 8,000 members worldwide. Dr. Barrash was a member of the AANS from 1975 until he voluntarily resigned from the association in 2011.

In 2006, Dr. Barrash was retained as an expert witness by the claimant in a medical malpractice suit filed against Dr. Masaki Oishi in McLennan County, Texas (the "Glass Malpractice Action"). The claimant, Mr. Bill N. Glass, had undergone a posterior lumbar interbody fusion ("PLIF") on February 2, 2004 (the "First Surgery"). That surgery—performed by Dr. Oishi—involved adding bone grafts between multiple vertebrae in Mr. Glass's spine to trigger a biological response that causes bone to grow and fuse the vertebral elements together. Mr. Glass awoke from the First Surgery with severe pain in his left leg. A month later, a CT scan revealed that one of the bone grafts installed in the First Surgery was in the wrong position and impinging on one of Mr. Glass's nerve roots.[3] (Doc. No. 80-3 ("Barrash SOF"), at ¶ 12.) Dr. Oishi operated again on March 7, 2004 (the "Second Surgery") to relieve the impingement, but was able to remove only part of the offending bone graft because it was firmly wedged in between two of Mr. Glass's vertebrae. After the Second Surgery, Mr. Glass developed a serious postoperative infection. Dr. Oishi operated again (the "Third Surgery"), and Mr. Glass was hospitalized for an intensive treatment of a postoperative staph infection, which developed into

---

[2] Unless otherwise indicated, the facts included in this section are undisputed.

[3] The AANS objects to the characterization of the CT scan as "reveal[ing]" that one of the bone grafts was in the wrong position. (Doc. No. 85 ("AANS Response to SOF"), at ¶ 12.) Resolution of the factual dispute is unnecessary, as it does not affect the Court's rulings.

an infection of the bone. Following his treatment by Dr. Oishi, Mr. Glass suffered chronic pain and was unable to work.

In the Glass Malpractice Action, Dr. Barrash prepared a pre-suit written expert report supporting the claims and later provided expert deposition testimony. Dr. Barrash offered several expert opinions criticizing Dr. Oishi's treatment of Mr. Glass, including:

> (1) One of the bone grafts installed at the First Surgery was either not appropriately placed or had moved during the surgery.
>
> (2) Dr. Oishi took too long to perform the First Surgery.
>
> (3) Dr. Oishi did not adequately prevent or treat Mr. Glass's postoperative infection.
>
> (4) Dr. Oishi's inadequate treatment of Mr. Glass's postoperative infection was the cause of his chronic pain.

Dr. Oishi subsequently settled the case.

Upon the conclusion of the Glass Malpractice Action, Dr. Oishi—utilizing the AANS's internal procedures—brought charges against Dr. Barrash for violations of the AANS's Rules for Neurosurgical Medical/Legal Expert Opinion Services (the "Rules for Expert Opinion Services"). The AANS Rules for Expert Opinion Services provide, in pertinent part:

> A. Impartial Testimony
>
> 1. The neurosurgical expert witness shall be an impartial educator for attorneys, jurors and the court on the subject of neurosurgical practice.
>
> 2. The neurosurgical expert witness shall represent and testify as to the practice behavior of a prudent neurological surgeon giving different viewpoints if such there are.
>
> 3. The neurosurgical expert witness shall identify as such any personal opinions that vary significantly from generally accepted neurosurgical practice.
>
> 4. The neurosurgical expert witness shall recognize and

3

>       correctly represent the full standard of neurosurgical care and shall with reasonable accuracy state whether a particular action was clearly within, clearly outside of, or close to the margins of the standard of neurological care.
>
> 5. The neurosurgical expert witness shall not be evasive for the purpose of favoring one litigant over another. The neurosurgical expert shall answer all properly framed questions pertaining to his or her opinions on the subject matter thereof.
>
> B. Subject Matter Knowledge
>
>    . . .
>
> 2. The neurosurgical expert witness shall review all pertinent available medical information about a particular patient prior to rendering an opinion about the appropriateness of medical or surgical management of that patient.
>
>    . . .

In his grievance to the AANS, Dr. Oishi accused Dr. Barrash of providing biased testimony in the Glass Malpractice Action and of failing to review all pertinent available medical information before giving his opinions. Dr. Oishi's charges against Dr. Barrash were forwarded to the AANS Professional Conduct Committee (the "PCC"). Dr. Barrash submitted written responses to Dr. Oishi's complaints. A hearing was conducted on October 25, 2009, at which both Dr. Oishi and Dr. Barrash were questioned by six members of the PCC—Drs. Ben Blackett, Hal Hankinson, Stephen Giannotta, Roberto Heros, Volker Sonntag, and Clarence Watridge. Dr. Barrash was represented by counsel at the PCC hearing.

The PCC subsequently determined that Dr. Barrash had violated the Rules for Expert Opinion Services and recommended in a written report (the "PCC Report") that the AANS suspend Dr. Barrash's membership for six months. Prior to the meeting of the AANS Board of Directors at which the PCC Report was to be discussed, Dr. Barrash submitted a written response

4

to the PCC's findings. He also attended the AANS Board meeting on April 30, 2010 with counsel. After hearing from both Dr. Barrash and Dr. Blackett—the Chairman of the PCC—the Board of Directors agreed that Dr. Barrash's testimony violated the Rules for Expert Opinion Services, but decided to censure him instead of suspending his membership.

Dr. Barrash exercised his right under the AANS bylaws to appeal the decision of the Board of Directors to the AANS membership. Dr. Barrash submitted a written statement to the membership in support of his appeal; the President of the AANS submitted a written statement in support of the Board's decision to censure Dr. Barrash (the "President's Statement). The appeal was heard on April 11, 2011 at the Annual Business Meeting of the AANS. Dr. Barrash attended the meeting with counsel and read a statement to the members in attendance. The members voted to uphold the censure. On or about April 12, 2011, the AANS published a Notice of Censure (the "Censure") on its website, stating:

> Dr. J. Martin Barrash, following an appeal to the AANS general membership on April 11, 2011, has been censured for giving expert testimony without having seen the imaging studies relevant to that testimony, and for failure to provide unbiased testimony during part of a deposition in a civil lawsuit.

## II. LEGAL STANDARDS

### A. Private due process

Texas has a strong public policy against reviewing the *substance* of a private organization's adjudication of a dispute involving one of its members—known as the doctrine of judicial non-intervention, and explicated at length in many of the Court's prior orders in this case. Texas does permit, however, judicial review of whether the private organization afforded due process to the affected member. *See, e.g., Adams v. Am. Quarter Horse Ass'n*, 583 S.W.2d 828, 834 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.) ("[E]very tribunal which has the

power and authority to adjudicate matters involving legal questions are bound by the traditional notions of due process."). Courts have defined due process in such a context to be minimal. For example, in *Hatley v. American Quarter Horse Association*, the Fifth Circuit suggested that due process is satisfied with notice and a hearing. *See* 552 F.2d 646, 656 (5th Cir. 1977). Moreover, the Fifth Circuit contemplated that an organization may, by contract or agreement, redefine its process to be even more minimal. *See id.* at 657 ("Had [the rule in question] specifically provided that registration [of plaintiff's horse] under [the rule] was within the sole discretion of the Executive Committee without the requirement of a hearing, then conceivably defendants could have prevailed under a consent or waiver theory."). In the absence of any private definition of what process is due, however, courts generally analogize to judicial proceedings. *See Adams*, 583 S.W.2d at 834.

Notwithstanding the doctrine of judicial non-intervention, Texas also empowers courts to afford relief to an aggrieved member based on the *substance* of a private adjudication in narrowly defined circumstances. As commonly phrased, the exception permits judicial intervention when a private organization has "substitute[d] legislation for interpretation;" "transgress[ed] the bounds of reason, common sense, fairness;" or "contravene[d] public policy, or the laws of the land." *Brotherhood of R.R. Trainmen v. Price*, 108 S.W.2d 239, 241 (Tex. Civ. App.—Galveston 1937, writ dism'd); *see also Dallas Cnty. Med. Soc'y v. Ubinas Brache*, 68 S.W.3d 31, 41 (Tex. App.—Dallas 2001, pet. denied).

**B.     Federal Rule 56**

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). "Summary judgment is proper 'if the pleadings, depositions, answers to

6

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation marks and citation omitted). "Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Dr. Barrash's due process claim consists of two parts: (1) that AANS violated Dr. Barrash's private, contractual right to due process and (2) that the violation impaired an "valuable right" or "important economic interest" of Dr. Barrash. (Doc. No. 27 ("Am. Compl."), at ¶¶ 160-65; Doc. No. 78 ("MSJ"), at 9, 17.) The AANS disputes that there is a genuine issue of material fact regarding either part of the claim. (MSJ at 1-2.) Dr. Barrash agrees that there is no genuine issue of material fact regarding due process, but believes that the undisputed facts demonstrate a *lack* of due process. Consequently, Dr. Barrash requests partial summary judgment as to the existence of a due process violation, and asks the Court to reserve only the extent of his damages for trial by jury. (Doc. No. 80 ("MPSJ"), at 4, 25; Doc. No. 86 ("MSJ Opp."), at 25.)

#### A. Whether the AANS failed to provide Dr. Barrash due process

The parties are aligned on a single point: neither believes that there exists a genuine issue of material fact on whether the AANS provided Dr. Barrash due process. In essence, all the facts are undisputed, and they simply disagree on the legal effect of those facts.

7

The AANS emphasizes the numerous procedural protections afforded Dr. Barrash throughout the grievance process. (MSJ at 11.) Dr. Barrash disputes that the procedural protections were sufficient, because he was not put on notice of the scope of the PCC Hearing; because he was not given guidance as to what testimony was unacceptable prior to his alleged violation; because the PCC's specific findings against him are indefensible as a matter of medical science; and because the AANS is biased against members who testify on behalf of plaintiffs in malpractice cases. (MPSJ at 15-24; MSJ Opp. at 6-23.) Because Dr. Barrash was censured for having violated the AANS's rules in two different ways, the Court will analyze the undisputed facts in view of the particular finding of the PCC.[4]

### 1. Testimony regarding Dr. Oishi's initial placement of the bone graft

Dr. Barrash testified in the Glass Malpractice Action that the bone graft was probably not appropriately placed in the initial PLIF. (Doc. No. 80-13, at 21-24, 42.) The PCC faulted Dr. Barrash for offering this testimony when he had not seen intraoperative x-rays taken on the day of the PLIF. It concluded that Dr. Barrash's willingness to testify when he had not been provided "available and relevant x-rays" was a violation of Rule B2. (*Id*. at 9-10.) The PCC Report also noted the opinion of the Committee that the intraoperative x-ray "appeared to show proper position of the L4-5 interbody graft and pedicle screws," and that Dr. Barrash's opinion

---

[4] Dr. Barrash testified in the Glass Malpractice Action that Dr. Oishi took too long to perform the initial PLIF. (Doc. No. 80-13, at 25.) The PCC found fault with this statement, but equivocated regarding whether it was objectionable because it constituted "intentional misrepresentation (improper advocacy)" or because it indicated "lack of sufficient subject matter knowledge." (*Id*. at 9.) Dr. Barrash now admits that his testimony was substantively incorrect, and that the length of time Dr. Oishi took to perform the initial PLIF was within professional norms. He claims that his incorrect testimony was due to a "temporary misapprehension" regarding the specific type of surgery that Dr. Oishi performed on Mr. Glass. (Doc. No. 86 ("MSJ Opp."), at 12 n.2.) Neither side spends much time discussing this aspect of the PCC Report. The Court takes from this consensus that the PCC's criticism of Dr. Barrash's testimony on the length of the PLIF procedure was not incorporated in the Censure and need not be addressed.

regarding the graft position was "incorrect." (*Id.* at 8, 10.) Following the votes of the AANS Board and the general membership to adopt the PCC's recommendation, the Censure described in relevant part:

> Dr. J. Martin Barrash . . . has been censured for giving expert testimony without having seen the imaging studies relevant to that testimony . . .

Dr. Barrash cannot dispute that he was on notice of this charge. Dr. Oishi sent three letters to the AANS complaining of Dr. Barrash's testimony in the Glass Malpractice Action—on November 10, 2008; November 24, 2008; and December 29, 2008. All of these "charging letters" were forwarded to Dr. Barrash. (Doc. No. 79 ("AANS SOF"), at ¶¶ 46, 49; Doc. No. 93 ("Resp. to AANS SOF"), at ¶¶ 46, 49.) In the November 24th charging letter, Dr. Oishi complained that Dr. Barrash gave the relevant deposition testimony without "review[ing] the intraoperative X-rays [which] demonstrat[ed] proper hardware and bone graft placement." (Doc. No. 80-13, at 15.) Dr. Oishi stated his belief that the testimony "appears to violate [Rule] B.2." (*Id.* at 15-16.)

Nor can Dr. Barrash dispute that he had opportunity to respond to the charge. Dr. Barrash provided two written statements to the PCC, defending against the criticisms in Dr. Oishi's charging letters. (AANS SOF ¶¶ 47, 50; Resp. to AANS SOF ¶¶ 47, 50.) He attended the PCC hearing and gave testimony. He participated in two levels of appeal—with the Board and the general membership—during which he submitted two additional written statements. Throughout the process, he made a number of counter-arguments to the charge that he had violated Rule B2. He claimed that the intraoperative x-rays were not "pertinent" due to other, more convincing evidence that the graft was initially misplaced. (Doc. No. 80-10, at 2-4; Doc. No. 80-11, at 15; Doc. No. 80-14, at 26-27, 31-32, 63-65.) He claimed that the x-rays were not "available" because he had requested them—from either Mr. Glass's or Dr. Oishi's attorney, or both—and they were

9

never provided. (Doc. No. 80-11, at 14-15; Doc. No. 80-14, at 33-34, 49.) And he suggested that review of the x-rays was unnecessary because he had reviewed the reports of radiologists whom he personally knew and trusted. (Doc. No. 80-14, at 32-33.) The PCC explicitly and implicitly rejected these arguments in the PCC Report. (Doc. No. 80-13, at 7, 9-10.) The Board and the general membership, as indicated by their respective votes, sided with the PCC.

Despite being provided notice, opportunity to respond, a hearing, and two levels of appeals on the charge that he violated Rule B2 by testifying without having seen the intraoperative X-ray, Dr. Barrash nonetheless claims a violation of due process. First, Dr. Barrash argues that the AANS violated his due process rights by not giving him notice that the PCC would review the *substance* of his opinion regarding Dr. Oishi's placement of the bone graft. (MPSJ at 15; MSJ Opp. at 8-9.) Second, Dr. Barrash claims that the PCC's conclusions that the intraoperative x-ray was "relevant" and that it disproved his testimony in the Glass Malpractice Action are indefensible as a matter of medical science. (MPSJ at 21-24; MSJ Opp. at 21-23.) To support this latter argument, Dr. Barrash relies, at least in part, upon the expert testimony of Dr. Vrijesh S. Tantuwaya. (MPSJ at 24; MSJ Opp. at 22.)

Both of Dr. Barrash's arguments suffer from a mischaracterization of the Censure. Dr. Barrash clearly believes that the intraoperative x-ray does not undermine his testimony regarding Dr. Oishi's placement of the bone graft. The PCC clearly disagreed, at least at the time it wrote the PCC Report.[5] But the finding which was later incorporated into the Censure was not this substantive disagreement with Dr. Barrash's testimony; it was the PCC's conclusion that Dr. Barrash violated Rule B2 by not viewing the intraoperative x-ray prior to rendering his

---

[5] According to Plaintiff, deposition testimony of PCC members taken in connection with this case suggests a retreat from the Report's conclusion that the intraoperative x-ray "appeared to show proper position of the L4-5 interbody graft and pedicle screws." (Doc. No. 78 ("MPSJ"), at 21-24.)

10

testimony. In other words, even after viewing the intraoperative x-ray, the PCC could have agreed with Dr. Barrash that the bone graft was likely misplaced during the PLIF, but nonetheless have faulted him for testifying without viewing the x-ray. The PCC's substantive disagreement is ultimately incidental.

Earlier this year, the Court noted its misgivings regarding Dr. Barrash's attempts to relitigate this charge on the theory that the PCC "legislated" rather than "interpreted" Rule B2:

> Dr. Barrash clearly disagrees with the PCC and the AANS Board's interpretation of Rule B2 and their application of the rule to his case. His interpretation of the rule is not unreasonable; it may even be preferable to the interpretation adopted by the AANS and ratified by the general membership in their vote to censure Dr. Barrash. But his vociferous, full-throated defense of his position does not transmute the AANS's action from interpretation to legislation.

(Doc. No. 45, at 20.) The Court continues to find Dr. Barrash's disagreement with the AANS as to the "correct" interpretation of Rule B2 to be non-justiciable. Because Dr. Barrash has failed to provide evidence that the AANS violated due process when it censured him for violating Rule B2, the AANS is entitled to summary judgment on this aspect of Dr. Barrash's claim.

### 2. Testimony regarding the cause of Mr. Glass's chronic pain

In his pre-suit report to Mr. Glass's attorney, dated August 10, 2006, Dr. Barrash wrote:

> Mr. Glass now has a chronic pain problem, not from the surgery, not from the injury, but from the lack of following the standard for rapid treatment of a suspected and then confirmed infection. Were it not for the negligence on the part of Dr. Oishi in not recognizing and addressing the infection that was smoldering in Mr. Glass, his condition today would not be one of chronic pain, disability, and the attendant depression and hopelessness.

(Doc. No. 80-13, at 44-45.) The PCC considered this testimony to be speculative and deemed it "improper advocacy" because "[c]hronic pain syndromes can follow injuries without surgery, and surgery with or without complications." (*Id*. at 10.) Following the votes of the AANS Board and the general membership to adopt the PCC's recommendation, the Censure described in

relevant part:

> Dr. J. Martin Barrash . . . has been censured . . . for failure to provide unbiased testimony during part of a deposition in a civil lawsuit.

The Court previously questioned whether "improper advocacy" was really prohibited by the Rules for Expert Opinion Services, because the term is not expressly used or defined therein. (Doc. No. 45, at 20-21.) In its summary judgment briefing, the AANS explains that "improper advocacy" is shorthand for any violation of Section A of the Rules for Expert Opinion Services. (Doc. No. 78 ("MSJ"), at 14; Doc. No. 84 ("MPSJ Opp."), at 13.) The AANS does appear to use this term regularly, as well as the term "egregious advocacy," to describe adjudicative findings against members who failed to provide "impartial" testimony under Section A. (E.g., Doc. No. 78-4, at 15, 22, 28.) Indeed, the Censure in this case described Dr. Barrash's transgression as "failure to provide unbiased testimony" rather than "improper advocacy." The Court accepts the AANS's explanation of the term "improper advocacy." It also accepts that Dr. Barrash was aware of the rules regarding "impartial" expert testimony contained in Section A of the Rules for Expert Opinion Services, even if he was unaware that the AANS colloquially referred to violations of those rules as "improper advocacy" or "egregious advocacy."

But this does not resolve whether Dr. Barrash was adequately put on notice that he would need to defend against the alleged partiality of his causation-related testimony. Dr. Barrash contends that he was first made aware that the *substance* of his causation-related testimony would be reviewed by the PCC when Dr. Blackett began questioning him about it at the October 25, 2009 hearing. (MPSJ at 10.) He denies that Dr. Oishi's three "charging letters" provided him notice of the charge, and claims that he was deprived of the opportunity to prepare a targeted defense. (*Id.* at 15.) There is merit to Dr. Barrash's position.

In his November 10th charging letter, Dr. Oishi complained generally: "Dr. Barrash gave

12

testimony that was not impartial. He did not allow for differences of opinion or viewpoints. He clearly favored the plaintiff over the defense. He did not review all pertinent available medical information about the patient before rendering his opinion about the appropriateness of management." (Doc. No. 80-13, at 13.) In response to the November 10th letter—which was less than a page long—the AANS's counsel, Russell M. Pelton, instructed Dr. Oishi to provide more detail regarding his charges:

> We would like you to forward to us the documentation you have supporting your charge of unprofessional conduct by Dr. Barrash, specifically including any transcripts of his relevant testimony with designations of the pages and lines you believe are most relevant to your charge. We request that you indicate which particular sections of the Rules or Code of Ethics you believe have been violated.

(Barrash SOF ¶ 38; Doc. No. 85 ("AANS Response to SOF"), at ¶ 38.) Dr. Oishi then sent the November 24th and December 29th charging letters, both of which highlighted specific passages of Dr. Barrash's testimony. Dr. Barrash's pre-suit export report was addressed only in the December 29th letter. Dr. Oishi claimed that Dr. Barrash's testimony from the pre-suit report—including the specific passage that the PCC identified as "improper advocacy"—"appears to violate [Rule] B.2." because Dr. Barrash had never examined or treated Mr. Glass and thus was not "examining available medical information." (Doc. No. 80-13, at 40.)

Taking the three charging letters together, Dr. Barrash is correct that Dr. Oishi did not criticize his causation-related testimony, beyond faulting him for not meeting or treating Mr. Glass. The Court must agree that this failed to put him on notice to prepare a defense regarding the "improper advocacy" or partiality of his causation-related testimony.

The AANS contends that Dr. Oishi's charging letters fairly put the "improper advocacy" of Dr. Barrash's causation-related testimony into play, because the November 10th charging letter accused Dr. Barrash of giving "testimony that was not impartial" and because the

December 29th charging letter criticized the relevant language in the pre-suit export report (although on a basis other than partiality).[6] (Doc. No. 84 ("MPSJ Opp."), at 7-10; Doc. No. 87 ("MSJ Reply"), at 3-4.) The Court is sensitive to the fact that it cannot easily disrupt the deliberative process of the AANS, or substitute its judgment for that of the AANS. But on the question of fair notice, the Court has some expertise of its own, and the AANS's argument simply goes too far. Under its theory, Dr. Oishi's efforts to more concretely identify his objections to Dr. Barrash's testimony—*undertaken in response to the AANS's explicit instruction*—were gratuitous. The Court cannot accept such a result.

Moreover, even if Dr. Barrash did receive sufficient notice of the specific charge to which he needed to mount a defense, it is fatally unclear what transgression the PCC ultimately found Dr. Barrash to have committed. The Court previously suggested that the PCC sanctioned Dr. Barrash because it simply disagreed with his ultimate conclusion as to causation.[7] (Doc. No. 45, at 20.) But the summary judgment record is not so clear. In deposition testimony, at least some of the PCC members took issue with the stridency of Dr. Barrash's causation-related

---

[6] This is more than simply a litigation position; several PCC members testified in deposition regarding their belief that they had plenary power to review any of Dr. Barrash's testimony from the Glass Malpractice Action for evidence of bias. (Doc. No. 80-5, at 88-92, 218, 421.) According to Dr. Barrash, the AANS by-laws do not give the PCC this authority. He claims that the PCC was limited to either sustaining or dismissing particular charges of unethical conduct raised by Dr. Oishi. (Doc. No. 80-3 ("Barrash SOF"), at ¶¶ 65-66.) As the Court has noted in the past, however, the AANS's failure to abide by certain internal procedural protections is not redressable by judicial review. (Doc. No. 63, at 4 ("The Court feels compelled to conclude that . . . contractual 'due process' is at most a one-way valve. In other words, a private organization may be able to avoid judicial oversight by contractually eliminating default procedural protections . . . but it does not appear to invite more judicial scrutiny by expanding them.").) Consequently, the Court confines its analysis to questions of basic due process, rather than the AANS's adherence to its internal procedures.

[7] Dr. Barrash suggests that any substantive disagreement with his causation-related testimony is unsupportable as a matter of medical science, and cites the expert testimony of Dr. Vrijesh S. Tantuwaya and Dr. Allen W. Burton. (MPSJ at 19.) For reasons expressed in the text, the Court finds it unnecessary to rely upon Dr. Tantuwaya's and Dr. Burton's testimony.

testimony, rather that his substantive conclusion. For example, Drs. Blackett and Hankinson indicated that Dr. Barrash would not have been censured if he had testified that Mr. Glass's infection and associated complications "contributed" to his development of chronic pain. (Doc. No. 80-5, at 95, 201.) Consonant with such testimony, the AANS argues in its summary judgment briefing that the flaw in Dr. Barrash's testimony was its "definitive" nature. (MPSJ Opp. at 20; MSJ Reply at 8.) The Court cannot determine whether this litigation position is consistent with the contemporaneous evidence, or a post hoc rationalization; the relevant portion of the PCC Hearing consisted of a *single* question to Dr. Barrash and consumed only three pages of a 75-page transcript, while the PCC Report does not resolve the exact nature of the PCC's criticism. Nonetheless, the Court accepts that the PCC objected to the presentation of Dr. Barrash's opinion, rather than the merits of its substantive conclusion.

Even with this understanding, however, the exact nature of the objection to Dr. Barrash's choice of words remains a mystery. Perhaps the PCC believed that Dr. Barrash had violated Rule A1's instruction to be an "impartial educator." Maybe it faulted Dr. Barrash for failing to "giv[e] different viewpoints if such there are" as required by Rule A2. The PCC Report simply does not say. If the Court, three years later and with benefit of a full record, is still at a loss for determining which rule Dr. Barrash was found to have broken, it has no difficulty determining that the grievance process was fundamentally unfair to Dr. Barrash.[8]

---

[8] Dr. Barrash repeatedly suggests that the AANS and the PCC acted in bad faith and with malice against him, because he provided testimony in support of a medical malpractice plaintiff. (*E.g.,* MPSJ at 21.) Although the Court finds that Dr. Barrash received unfair treatment in one aspect of his censure, it wishes to make clear that it does not impute ill will to the AANS or to any member of the PCC. As explained in *Austin v. American Association of Neurological Surgeons*, there is a non-malicious explanation for why professional organizations are more likely to discipline members who testify on behalf of plaintiffs: members accused of malpractice, such as Dr. Oishi, are more likely to report objectionable testimony to the organization, due to their personal and professional self-interest. *See* 253 F.3d 967, 972 (7th Cir. 2001).

15

Texas law requires private organizations like the AANS to provide "notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case." *Adams*, 583 S.W.2d at 834. These basic protections were missing when the AANS censured Dr. Barrash for engaging in "improper advocacy." Dr. Barrash is entitled to summary judgment on this aspect of his claim.

> **B.  Whether the violation of due process impaired a property right or other valuable right**

As noted above, the AANS is entitled to summary judgment on Dr. Barrash's due process claim as to the part of the Censure addressing Dr. Barrash's failure to review the intraoperative x-ray, but not as to the part of the Censure addressing Dr. Barrash's "improper advocacy." According to Dr. Barrash, this leaves one issue of fact for resolution by the jury: the extent of his damages. (MPSJ at 24-25.) The AANS disagrees, arguing that Dr. Barrash's evidence does not establish that the Censure deprived Dr. Barrash of a property right or an "important economic interest." (MSJ at 17-19.)

The AANS relies primarily on Illinois law, which sharply curtails judicial review of private organizations when the alleged impairment of an important economic interest is not sufficiently severe. (MSJ at 18.) Specifically, the Seventh Circuit—applying Illinois law—has found a 65% decline in a "sideline" consulting business to be insufficient, *see Austin v. Am. Ass'n of Neurological Surgeons*, 253 F.3d 967, 971-72 (7th Cir. 2001), and has hinted that it would reach the same conclusion even if the consulting business is the primary employment in which the affected member is engaged. *See Brandner v. Am. Academy of Orthopaedic Surgeons*, 760 F.3d 627, 629-30 (7th Cir. 2014).

Dr. Barrash's evidence would be insufficient under the Seventh Circuit's stringent test. Dr. Barrash's damages expert has opined that his consulting revenue declined from over

$533,000 in 2011 to approximately $473,000 in 2012 and approximately $408,000 in 2013. (Doc. No. 80-7, at 25.) These represent declines of 11% and 23%, respectively, from the 2011 "baseline"[9]—much less steep declines than the 65% drop found insubstantial in *Austin* and referenced in *Brandner*. Moreover, the revenue which remains is quite healthy by all measures. *See Brandner*, 760 F.3d at 630 ("We know from *Austin* that even a 65% fall in litigation-related income would not allow judicial review of the Academy's decision, if it left [plaintiff] with a healthy remainder."); *see also Austin*, 253 F.3d at 971.

Dr. Barrash correctly points out that his claim is governed by Texas law, not Illinois law. (MSJ Opp. at 24.) Texas law requires "a property right or other valuable right" to be at issue. *See Stevens v. Anatolian Shepherd Dog Club of Am., Inc.*, 231 S.W.3d 71, 76 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Texas law is not as exacting as Illinois law regarding the scope of this requirement. In one case, "a property right or other valuable right" was shown when an organization's failure to register a member's horse as a quarter horse reduced its value from nearly $100,000 to less than $10,000. *See Hatley*, 552 F.2d. at 655. But in another, it was shown by the fact that expulsion prevented the member's estate from receiving approximately $600 in life insurance benefits following her death. *See Masonic Grand Chapter of Order of Eastern Star v. Sweatt*, 329 S.W.2d 334, 335 & 337 (Tex. Civ. App.—Fort Worth 1959, writ ref'd n.r.e.). Because *Sweatt* indicates that the size of the property right need not be large, the Court assumes without deciding that Dr. Barrash's 11% and 23% decline in observed revenue is sufficient to show an impairment of a "property right or other valuable right" under Texas law.

The Court harbors serious doubts, however, about the sufficiency of Dr. Barrash's

---

[9] The AANS disputes that 2011 is an appropriate baseline. It argues that 2011 was an unusually productive year for Dr. Barrash, and that his average consulting revenue in the three immediately preceding years was only approximately $365,000. (MPSJ Opp. at 21; Doc. No. 87 ("MSJ Reply"), at 8.)

damages-related evidence. Most importantly, the evidence does not attempt to disentangle the impact of the first part of the Censure—on which AANS provided due process—from the impact of the second part of the Censure—on which AANS did not provide due process. For example, Dr. Barrash has provided the affidavit of Adam Taranto from Mednick Associates, an expert witness referral service. Mr. Taranto states that he decided to stop referring Dr. Barrash to Mednick's clients as a result of the Censure. (Doc. No. 80-4, at ¶ 4.) He believed that the fact of censure could make Dr. Barrash a liability to his clients, and that, as a result, continuing to refer him would reflect poorly on Mednick. (*Id*.) Mr. Taranto does not indicate that he would have continued to refer Dr. Barrash to Mednick's clients if he had been censured only for failing to review the intraoperative x-ray.

Because Dr. Barrash's current submissions anticipate total reversal of the Censure—which is not warranted on the undisputed facts—he has not addressed how he will establish damages flowing from only one part of the Censure. Nor has he indicated whether he seeks injunctive relief against the AANS, as indicated in the prayer of his Amended Complaint. To resolve these issues, the Court will convene a hearing in advance of the scheduled October 28, 2014 trial date.

## IV. CONCLUSION

For the reasons stated above, the undisputed facts show that the AANS failed to provide due process to Dr. Barrash in connection with its second ground for Censure: that Dr. Barrash engaged in "improper advocacy" in the Glass Malpractice Action. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 80) is **GRANTED IN PART** as to this aspect of Dr. Barrash's due process claim. In all other respects, Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

In connection with its opposition to Dr. Barrash's Motion for Partial Summary Judgment, the AANS renewed its motion to strike Dr. Barrash's medical experts. As noted in the text above, the Court did not find it necessary to rely upon testimony of Plaintiff's medical experts to rule on Dr. Barrash's motion. Therefore, the Court **DENIES** Defendant's Renewed Motion to Strike (Doc. No. 82) as moot.

The undisputed facts also establish that the AANS provided due process to Dr. Barrash in connection with its first ground for Censure: that Dr. Barrash "[gave] expert testimony without having seen the imaging studies relevant to that testimony." Defendant's Motion for Summary Judgment (Doc. No. 78) is therefore **GRANTED IN PART** as to this aspect of Dr. Barrash's due process claim. In all other aspects, the Court reserves judgment pending a hearing on whether there remains an issue of fact regarding damages to be tried to a jury.

**IT IS SO ORDERED.**

**SIGNED** in Houston, Texas, on this the fourteenth day of October, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE